UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ANGEL SIFUENTES,<br>Plaintiff,<br>v.<br>DROPBOX, INC.,<br>Defendant. | Case No. 20-cv-07908-HSG<br>**ORDER DENYING MOTION TO COMPEL ARBITRATION**<br>Re: Dkt. No. 40 |

Pending before the Court is Defendant Dropbox, Inc.'s motion to compel arbitration, briefing for which is complete. *See* Dkt. Nos. 40 ("Mot."), 42 ("Opp."), 47 ("Reply").[1] The Court heard oral argument on the motion on January 20, 2022. *See* Dkt. No. 54. For the reasons detailed below, the Court **DENIES** the motion.

**I.    BACKGROUND**

Pro Se Plaintiff David Angel Sifuentes III filed this action against Defendant on November 9, 2020. Dkt. No. 1. He then filed an amended complaint on January 21, 2021. Dkt. No. 10 ("Am. Comp."). Plaintiff alleges that his Dropbox account was compromised in a 2012 data breach, which put his personal information at risk. *Id.* at 2. Plaintiff further alleges that Dropbox failed to inform him of the breach, and that his personal information has been stolen and used by "hackers and cyber criminals." *Id.* Plaintiff asserts that as a result of the data breach his bank account has been made vulnerable, he has to frequently change his log-in information for various accounts, and he worries that his personal information could be used to commit crimes. *Id.* at 2-3.

---

[1] Defendant also submitted a color copy of Exhibit B to the Declaration of Wendy Weber in support of Defendant's motion to compel arbitration. Dkt. No. 53. Plaintiff filed an additional, unsolicited opposition on February 8, 2022, Dkt. No. 55, but the Court finds that those arguments do not change the outcome of the motion.

1   On the basis of these facts, Plaintiff brings multiple causes of action, including claims for invasion of privacy by public disclosure of private facts, negligence, intentional infliction of emotional distress, and conversion in addition to violations of the Fair Credit Reporting Act, Fair and Accurate Credit Transactions Act of 2003, California Civil Code section 1798.29, and Michigan Law section 445.72. *Id.* at 1. Plaintiff seeks $550,000 in damages. *Id.* at 3.

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, sets forth a policy favoring arbitration agreements and establishes that a written arbitration agreement is "valid, irrevocable, and enforceable." 9 U.S.C. § 2; *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting federal policy favoring arbitration); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (same). The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. This federal policy is "simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989). Courts must resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Id.*

When a party moves to compel arbitration, the court must determine (1) "whether a valid arbitration agreement exists" and (2) "whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). The agreement may also delegate gateway issues to an arbitrator, in which case the court's role is limited to determining whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). In either instance, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2).

### III. DISCUSSION

#### A. Alleged Arbitration Agreement

Defendant contends that Plaintiff assented to terms of service ("TOS") that require arbitration. Defendant represents that, according to its records, Plaintiff signed up for Dropbox on December 15, 2011. Dkt. No. 40-1 Decl. of Wendy Weber ¶ 10 ("Weber Decl."). Defendant explains that when Plaintiff created his Dropbox account, he would have been "required to affirmatively check a box stating 'I agree to Dropbox Terms of Service' to affirmatively indicate [his] agreement to the Dropbox TOS and further press a button stating 'Create account.'" *See id.* ¶ 6. According to Defendant, the "TOS were visibly hyperlinked and set off by blue font color," and the hyperlink would have taken Plaintiff to the July 6, 2011 TOS. *Id.*; *see* Dkt. No. 40-1 Exhibit E. Defendant asserts that if Plaintiff did not click the checkbox and sign-up button, the registration process would have ended and he would not have been able to use Dropbox's platform. Weber Decl. ¶ 6.

Defendant maintains that Plaintiff has continuously had a Dropbox account since he signed up on December 15, 2011. *Id.* ¶ 10. Defendant represents that it has modified its terms of service twelve times since 2011. *Id.* ¶¶ 11-21; Mot. at 9. Defendant's position is that Plaintiff assented to each of these modifications by continuing to use the Dropbox service. Reply at 9. In a March 24, 2014 modification, Dropbox added an arbitration provision to its terms of service. Mot. at 8. Dropbox asserts that it notified users, including Plaintiff, of this change in an email, with hyperlinks leading to the new terms of service and Defendant's blog, as indicated by differently colored text. *See* Reply at 6; Dkt. No. 53 Exhibit A. The email also included multiple bullet points describing changes being made to the TOS, including:

> We're adding an arbitration section to our updated Terms of Service. Arbitration is a quick and efficient way to resolve disputes, and it provides an alternative to things like state or federal courts where the process could take months or even years. If you don't want to agree to arbitration, you can easily opt-out via an online form, within 30-days of these Terms becoming effective. This form, and other details, are available on our blog.

Dkt. No. 40-1 Exhibit B.

Defendant further contends that all terms of service since March 24, 2014 have included

substantially the same mandatory arbitration provision. Reply at 9. The September 24, 2019 terms of service, which were in effect when Plaintiff filed his Complaint, contain the following arbitration provision:

> *We Both Agree to Arbitrate*. You and Dropbox agree to resolve any claims relating to these Terms or the Services through final and binding arbitration by a single arbitrator, except as set forth under Exceptions to Agreement to Arbitrate below. This includes disputes arising out of or relating to interpretation or application of this "Mandatory Arbitration Provisions" section, including its enforceability, revocability, or validity.

Dkt. No. 40-1 Exhibit P; *see also* Mot. at 9. The September 24, 2019 TOS includes a provision for opting out of arbitration:

> *Opt-out of Agreement to Arbitration.* You can decline this agreement to arbitrate by clicking here and submitting the opt-out form within 30 days of first registering your account.[2] However, if you agreed to a previous version of these Terms that allowed you to opt out of arbitration, your previous choice to opt out or not opt out remains binding.

Dkt. No. 40-1 Exhibit P. It also includes a list of exceptions to the agreement to arbitrate, such as when a party brings a lawsuit solely for injunctive relief, that do not apply here. *See id.*

Plaintiff does not contest Defendant's representations about the design and content of the website or the Terms of Service. *See generally* Opp. Plaintiff also does not contest that he agreed to the July 6, 2011 TOS. *See* Opp. at 1-2. However, Plaintiff argues that the July 6, 2011 TOS does not contain an arbitration provision, and that he never agreed to any later terms of service. *See id.* at 1. Plaintiff contends that he "never read, clicked on[, or] accepted any updated terms and condition [*sic*] including any emails sent concerning any changes to the (TOS)'s and the arbitration agreement." *Id.*

### B. Validity of Arbitration Agreement

When the parties contest whether an agreement was formed, the party seeking to compel arbitration bears the burden of proving the existence of the agreement by a preponderance of the evidence. *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). Conversely, the party opposing arbitration is entitled to the benefit of all reasonable doubts and

---

[2] The words "clicking here" appear to be a hyperlink.

4

inferences. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991). Therefore, a court may find that an agreement to arbitrate exists as a matter of law "[o]nly when there is no genuine issue of fact concerning the formation of the agreement." *Id.* (citation and quotation omitted).

In determining whether an agreement was formed, the Court applies "general state-law principles of contract interpretation," without a presumption in favor of arbitrability.[3] *See Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (quotation omitted). The Ninth Circuit has recognized that while the rise of internet-based commerce "has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). One of those principles is that in order for a contract to be formed there must be mutual manifestation of assent. *Id.*

Courts generally evaluate online contracts as falling into one of two categories: (1) "clickwrap" agreements where a user is presented with the terms and conditions and must click on a button or box to indicate that he agrees before he may continue, which courts generally enforce; and (2) "browsewrap" agreements where the website's terms and conditions are provided to users via a hyperlink at the bottom of a webpage and a user's assent to the terms is assumed by his continued use of the website, which courts often view with skepticism. *See id.* at 1175–77. Online contracts can also be some blend of the two. *Id.* at 1176-77. Regardless, "the onus [is] on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 1179.

i.  **Plaintiff assented to the 2011 TOS.**

Plaintiff's assent to the January 6, 2011 TOS falls on the "clickwrap" end of the spectrum. He clicked a box stating, "I agree to Dropbox Terms of Service", and the July 6, 2011 TOS was hyperlinked next to that checkbox. *See* Weber Decl. ¶ 6, Exhibit A. Plaintiff had clear notice, and took physical action to manifest his assent. Plaintiff does not contest that he agreed to the

---

[3] Here, all relevant versions of the TOS contain a California choice-of-law provision, including the July 6, 2011 TOS.

1   2011 TOS at the time he created a Dropbox account, *see* Opp. at 1-2, and the Court finds that there was a mutual manifestation of assent to the 2011 TOS.  Importantly, however, the 2011 TOS did not have a mandatory arbitration provision.

### ii.     Defendants fail to show that Plaintiff had notice of the later terms of service.

Plaintiff denies that he agreed to the later terms of service that added mandatory arbitration provisions.  Opp. at 1.  Defendant, on the other hand, contends that Plaintiff assented to the subsequent versions by continuing to use Defendant's service.  Dkt. No. 47 at 7; *see also* Dkt. No. 40 at 9 n.2.  Assent by continued use of a web service is a traditional feature of browsewrap agreements.  *Nguyen*, 763 F.3d at 1176 ("The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists.") (citation omitted).  "Courts are more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms."  *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

The validity of an online agreement depends on whether the user had actual or constructive notice of the website's terms.  *See Nguyen*, 763 F.3d at 1177.  "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Berman*, 30 F.4th at 856.

Here, Plaintiff denies that he ever agreed to arbitrate, read any updated terms of service, or opened any emails from Defendant about these issues.  Opp. at 2-3.  Defendant explains that it had a policy of mass emailing its many subscribers about updated terms of service, *see* Dkt. No. 40-1 ¶ 7, but there is nothing in the record to suggest that Plaintiff saw or read the email, such as a read

receipt reflecting that Plaintiff opened the email.[4]  The Court finds that Defendant has not shown by a preponderance of the evidence that Plaintiff had actual notice of the updated terms of service. *See Norcia, LLC*, 845 F.3d at 1283.

To show that Plaintiff had inquiry notice, Defendant must show that he was provided reasonably conspicuous notice of the contract terms and unambiguously manifested his assent. *See Berman*, 30 F.4th at 856 .  "[O]nline providers have complete control over the design of their websites," and therefore have the responsibility to put users on notice of the terms to which they wish to bind consumers.  *Id.* at 857 (citations omitted).  Defendant acknowledges that between 2011 and 2019 it modified its terms of service no less than twelve times, and contends that it sent an email to Plaintiff in 2014 explaining the addition of a mandatory arbitration clause.  Reply at 9.  There is nothing in the record to suggest that Plaintiff could not use the service until he indicated his assent, that he would have been advised of new terms and conditions while using Defendant's services, or that Defendant ever tracked whether Plaintiff had opened its email.  Even if the email alone could be considered "reasonably conspicuous notice," Plaintiff took no action to unambiguously manifest his assent.  *See Berman*, 30 F.4th at 856 (requiring the consumer to "take[] some action, such as clicking a button or checking a box" in order to form an enforceable contract under inquiry notice theory).

Defendant essentially argues that it contracted for the right to change the terms at will because the 2011 TOS contains a provision stating that Defendant "may revise these Terms from time to time" and that continuing to use the service constitutes agreement to any revised terms. *See* Reply at 6; Dkt. No. 40-1 Exhibit E.  Defendant's argument misses the point.  Given the complete lack of evidence of notice within Defendant's service itself, Plaintiff's ongoing use of the service is irrelevant to determining whether he had actual or constructive notice of the post-2011 terms of service.  Moreover, the 2011 TOS essentially disavows any obligation to alert Plaintiff to changes: "If a revision, in our sole discretion, is material we will notify you (for example via email to the email address associated with your account."  *See* Dkt. No. 40-1 Exhibit

---

[4] Defendant also presented no evidence showing an email sent specifically to Plaintiff.

7

E. But Ninth Circuit law is clear that it is a website owner's duty to show clear notice and assent.

The Court finds that Defendant has not shown by a preponderance of the evidence that Plaintiff had actual or inquiry notice of the updated terms of service. *See Norcia, LLC*, 845 F.3d at 1283. Without actual or inquiry notice, there was no manifestation of mutual assent, and the later terms of service do not impose an enforceable agreement to arbitrate.

## IV.  CONCLUSION

The Court **DENIES** Defendant's motion to compel arbitration. The Court further **SETS** an initial telephonic case management conference for July 19, 2022 at 2:00 p.m and **DIRECTS** the parties to submit a joint case management statement by July 12, 2022. All parties and counsel shall use the following dial-in information to access the call:

**Dial-In:**  888-808-6929;

**Passcode:**  6064255

For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.

**IT IS SO ORDERED.**

Dated: 6/29/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge